UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
Western Beef Retail, Inc.,

                        Plaintiff,                        **MEMORANDUM & ORDER**
                                                            21-CV-02707 (DG) (CLP)

           -against-

Farmers Pride, Inc. d/b/a Bell & Evans,

                        Defendant.
------------------------------------------------------------------X
DIANE GUJARATI, United States District Judge:

      On April 14, 2021, Plaintiff Western Beef Retail, Inc. commenced this action in the

Supreme Court of the State of New York, County of Queens. *See* ECF No. 1 at 1. On May 14,

2021, the action was removed to this Court. *See generally* ECF No. 1. On July 6, 2022, Plaintiff

filed the operative Amended Complaint. *See* Amended Complaint ("Am. Compl."), ECF No. 26.

In general, Plaintiff alleges that Defendant Farmers Pride, Inc., which manufactures and

produces the "Bell & Evans" brand of chicken products, *see* Am. Compl. ¶ 18, "refused to sell

chicken products to Plaintiff, a supermarket chain with stores located in areas throughout the five

Boroughs and Nassau County with predominantly Black and Latino residents," and that

Defendant "wrongfully interfered with the contractual and business relations of Plaintiff with

third-party wholesalers to prevent sale of those chicken products to Plaintiff." *See* Am. Compl.

¶ 1. Plaintiff alleges that Defendant's actions were "knowingly and deliberately designed to

prevent the sale of its chicken products, produced by exclusively white-owned Pennsylvania

companies, to Plaintiff's Black and Latino customers based on their race, color, national origin,

and/or immigration or citizenship status, in brazen violation of the New York State Human

Rights Law and the New York City Human Rights Law." *See* Am. Compl. ¶ 2.

Plaintiff's Amended Complaint asserts four causes of action: (1) refusing to sell to Plaintiff based on the race, color, and/or national origin of Plaintiff's customers in violation of the New York State Human Rights Law, New York Executive Law § 296(13); (2) refusing to sell to Plaintiff based on the race, color, national origin, and/or immigration or citizenship status of Plaintiff's customers in violation of the New York City Human Rights Law, New York City Administrative Code § 8-107(18); (3) tortious interference with contract; and (4) tortious interference with prospective business relations.  *See* Am. Compl. ¶¶ 71-115.  As to each cause of action, Plaintiff seeks an amount not less than $10,000,000.  *See* Am. Compl. at 18.[1]

Pending before the Court is Defendant's Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").  *See* Notice of Motion to Dismiss, ECF No. 33; Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def.'s Br."), ECF No. 33-1; Reply Brief in Support of Defendant's Motion to Dismiss, ECF No. 35.  Plaintiff opposes Defendant's motion.  *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiff's Amended Complaint ("Pl.'s Br."), ECF No. 34.

For the reasons set forth below, Defendant's Motion to Dismiss is granted and the Amended Complaint is dismissed in its entirety.

## BACKGROUND

### I.    Factual Background

As alleged in the Amended Complaint, Plaintiff operates a chain of retail food stores throughout the five Boroughs of New York City, with additional locations in Nassau County.

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.  *See* Am. Compl. ¶ 8.

*See* Am. Compl. ¶ 11.  Plaintiff alleges that its stores are located in areas with primarily Black and Latino residents and that its business model is to focus on serving lower income and diverse ethnic neighborhoods in the New York metropolitan area.  *See* Am. Compl. ¶¶ 12-13.  As alleged in the Amended Complaint, Defendant manufactures and produces the "Bell & Evans" brand of chicken products.  *See* Am. Compl. ¶ 18.

Plaintiff alleges that, in or about January 2021, Plaintiff approached Defendant with a request to purchase Defendant's chicken products for retail sale in Plaintiff's stores.  *See* Am. Compl. ¶ 23.  Plaintiff alleges that Defendant informed Plaintiff that Defendant was not interested in selling its chicken products to Plaintiff directly.  *See* Am. Compl. ¶ 24.  Plaintiff alleges that Defendant referred Plaintiff to Foodirect, Inc. ("Foodirect"), a third-party wholesale distributor of meat products that sells Defendant's chicken products to retailers.  *See* Am. Compl. ¶ 25.  Plaintiff alleges that, following negotiations with Foodirect regarding pricing, quantity need, and delivery, Plaintiff entered into an agreement with Foodirect to regularly purchase Defendant's chicken products from Foodirect.  *See* Am. Compl. ¶ 26.  Plaintiff alleges that, between January and February 2021, "pursuant to agreement," Plaintiff issued weekly purchase orders to Foodirect and purchased Defendant's chicken products from Foodirect for sale at Plaintiff's various store locations.  *See* Am. Compl. ¶ 27.  Plaintiff alleges that Plaintiff received Defendant's poultry products from Foodirect, made payment in full to Foodirect, and sold the product, which was well received by Plaintiff's customers at its various store locations.  *See* Am. Compl. ¶ 28.  Plaintiff further alleges that, in or around late February 2021, without prior warning and despite the agreement between them, Foodirect informed Plaintiff that it had been instructed by Defendant to stop selling Defendant's chicken products to Plaintiff and thereafter refused any additional purchase orders from Plaintiff, despite Plaintiff having already purchased

$38,000 worth of Defendant's product. *See* Am. Compl. ¶ 29. Plaintiff alleges that, despite

Plaintiff's inquiries, Foodirect would not provide an explanation or reason why Defendant had

instructed Foodirect to stop selling Defendant's chicken products to Plaintiff. *See* Am. Compl.

¶ 30. Plaintiff alleges that "[i]f not for Defendant's directive to Foodirect to stop the relationship

with Plaintiff, Plaintiff would have continued its contractual arrangement with Foodirect,

continued issuing weekly purchase orders and buying Defendant's product from [Foodirect]."

*See* Am. Compl. ¶ 31. Plaintiff alleges that at no time prior to entering into its contract or during

the time Foodirect was selling Defendant's product to Plaintiff did Foodirect ever indicate that

the sale of Defendant's chicken products to Plaintiff required the express approval of Defendant.

*See* Am. Compl. ¶ 32. Plaintiff alleges that, at all relevant times, Defendant was aware of the

contract between Plaintiff and Foodirect, having directed Plaintiff to initially purchase

Defendant's product from Foodirect. *See* Am. Compl. ¶ 95.

Plaintiff alleges that it was determined to sell Defendant's chicken products in its stores

and reached out to another wholesaler, Robinson & Harrison Poultry Company, Inc.

("Robinson"), which sells Defendant's chicken products to retailers. *See* Am. Compl. ¶¶ 34-35.

Plaintiff alleges that it entered into an agreement to regularly purchase Defendant's chicken

products from Robinson. *See* Am. Compl. ¶ 36. Plaintiff alleges that, between late February and

March 2021, pursuant to the agreement, Plaintiff issued weekly purchase orders to Robinson and

purchased Defendant's chicken products from Robinson for sale at Plaintiff's various store

locations. *See* Am. Compl. ¶ 37. Plaintiff alleges that Plaintiff received Defendant's poultry

products from Robinson, made payment in full to Robinson, and sold the product, which was

well received by Plaintiff's customers at its various store locations. *See* Am. Compl. ¶ 38.

Plaintiff further alleges that, in or around late March 2021, without prior warning and despite the

4

agreement between them, Robinson informed Plaintiff that it had been instructed by Defendant to stop selling Defendant's chicken products to Plaintiff and thereafter refused any additional purchase orders from Plaintiff, despite Plaintiff having already purchased $20,000 worth of Defendant's product.  *See* Am. Compl. ¶ 39.  Plaintiff alleges that "[i]f not for Defendant's directive to Robinson to stop the relationship with Plaintiff, Plaintiff would have continued its contractual arrangement with Robinson, continued issuing weekly purchase orders and buying Defendant's product from [Robinson]."  *See* Am. Compl. ¶ 40.  Plaintiff alleges that, despite Plaintiff's inquiries, Robinson would not provide an explanation or reason why Defendant had instructed Robinson to stop selling Defendant's chicken products to Plaintiff.  *See* Am. Compl. ¶ 41.  Plaintiff further alleges that at no time prior to entering into its contract or during the time Robinson was selling Defendant's product to Plaintiff did Robinson ever indicate that the sale of Defendant's chicken products to Plaintiff required the express approval of Defendant.  *See* Am. Compl. ¶ 42.  Plaintiff alleges that, at all relevant times, Defendant was well aware of the contract between Plaintiff and Robinson.  *See* Am. Compl. ¶ 96.

Plaintiff alleges that, as it was still determined to sell Defendant's chicken products to its customers, in or around March 2021, Plaintiff reached out to Crescent Packing Corporation ("Crescent Packing"), another wholesale distributor of meat products, to inquire about purchasing Bell & Evans products once the terms of sale were negotiated.  *See* Am. Compl. ¶ 44.  Plaintiff alleges that the Crescent Packing representative initially informed Plaintiff that Crescent Packing would be happy to sell Bell & Evans chicken products to Plaintiff at wholesale, but, several days later, Crescent Packing informed Plaintiff that it would be unable to sell Bell & Evans chicken products to Plaintiff and refused to disclose the reason.  *See* Am. Compl. ¶¶ 45-46.

Plaintiff alleges that Plaintiff reached out to yet another meat product distributor, Porky Products, to inquire about purchasing Bell & Evans chicken products from Porky Products. *See* Am. Compl. ¶ 47. Plaintiff alleges that the Porky Products representative expressed enthusiasm about the prospect of Plaintiff purchasing Bell & Evans chicken products from Porky Products pending the establishment of terms of sale, but, several days later, the Porky Products representative informed Plaintiff that it was unable to sell Bell & Evans chicken products to Plaintiff and refused to disclose the reason. *See* Am. Compl. ¶¶ 48-49.

Plaintiff alleges that, in March 2021, Plaintiff attempted to communicate directly with Defendant regarding the basis for instructing Foodirect and Robinson to stop selling Defendant's chicken products to Plaintiff and for instructing Crescent Packing and Porky Products not to sell to Plaintiff, but Plaintiff was unsuccessful in its attempts to reach Defendant. *See* Am. Compl. ¶¶ 50-51. Plaintiff alleges that Defendant did not, at any point, provide to Plaintiff any reason for its refusal to allow its product to be sold at Plaintiff's stores. *See* Am. Compl. ¶ 54. Plaintiff further alleges that there was no legitimate business reason for Defendant to "implement a blacklist of Plaintiff purchasing [Defendant's] chicken products from any wholesaler," *see* Am. Compl. ¶ 56, and that Defendant's decision "made no sense from a business standpoint as Plaintiff, by purchasing nearly $60,000 worth of Defendant's chicken products in approximately two months had established itself as a valuable and profitable customer," *see* Am. Compl. ¶ 55.

Plaintiff alleges that "a review of the 'Product Locator' page on Defendant's website, which contains a map listing all the vendors throughout the United States that sell Defendant's chicken products, provides the basis for Defendant's actions." *See* Am. Compl. ¶ 57. More specifically, Plaintiff alleges that, in April 2021, Plaintiff, "through its agents," used the "Product Locator" to locate stores selling Defendant's chicken products in New York City and discovered

6

that Defendant's products are not available in any neighborhoods in which Plaintiff's stores are located, which include, among others, the neighborhoods of East Flatbush, East New York, Ocean Hill-Brownsville, Jamaica, Woodhaven, Hollis, St. Albans, South Bronx, and Washington Heights.  *See* Am. Compl. ¶¶ 58-59.  Plaintiff alleges that these neighborhoods consist of predominantly Black and Latino residents and are reputed to be communities of color.  *See* Am. Compl. ¶ 60.  Plaintiff further alleges that a review of Defendant's "Product Locator" also indicates that Defendant's chicken products are sold in areas documented to be predominantly Caucasian, including Brooklyn Heights, Park Slope, Greenpoint, Williamsburg, Manhattan south of 125th Street, Forest Hills, Astoria, Long Island City, and Rego Park.  *See* Am. Compl. ¶ 61.  Plaintiff alleges that, while Defendant's "Product Locator" will show "the occasional store that is located in a low-income neighborhood with predominantly Black and Latino residents, those are few and far between and generally are 'big box' supermarkets that mostly have stores in affluent, predominantly Caucasian areas so that the actual amount of chicken products that do wind up in the hands of Black and Latino customers are few and far between."  *See* Am. Compl. ¶ 62.  Plaintiff alleges that Defendant enacted its "blacklist" of Plaintiff "only after Defendant discovered that Plaintiff exclusively services low income areas with predominantly Black and Latino customers."  *See* Am. Compl. ¶ 75; *see also* Am. Compl. ¶ 63.

Plaintiff alleges that "Defendant refuses to sell its chicken products to Plaintiff because of the actual or perceived race, color, national origin, and/or immigration or citizenship status of Plaintiff's customer base."  *See* Am. Compl. ¶ 65; *see also* Am. Compl. ¶ 2.  Plaintiff further alleges that "Defendant refused to sell its product to Plaintiff and similarly situated companies based upon the race, color and/or national origin of Plaintiff's and similarly situated companies' customers."  *See* Am. Compl. ¶ 73; *see also* Am. Compl. ¶ 84.  And, Plaintiff alleges that in

interfering with Plaintiff's contracts with Foodirect and Robinson and with Plaintiff's prospective business relations with Crescent Packing and Porky Products, Defendant "was motivated solely and exclusively by Defendant's malice toward Plaintiff because of the race, color, national origin and/or immigration or citizenship status of Plaintiff's customers." *See* Am. Compl. ¶¶ 103, 113.

## II.     Procedural Background

On April 14, 2021, Plaintiff commenced this action against Defendant and Sechler Family Foods, Inc. ("Sechler") in the Supreme Court of the State of New York, County of Queens. *See* ECF No. 1 at 1. On May 14, 2021, the action was removed to this Court. *See generally* ECF No. 1.

On June 9, 2021, Plaintiff filed its Complaint. *See* ECF No. 7. On September 21, 2021, Defendant and Sechler moved to dismiss the Complaint pursuant to Rule 12(b)(6). *See* ECF No. 15; *see also* ECF No. 15-1.[2] Plaintiff opposed the motion. *See* ECF No. 16. Oral argument was held on June 15, 2022, Plaintiff was granted leave to file an Amended Complaint, and Defendant and Sechler's motion, ECF No. 15, was denied without prejudice to renewal. *See* ECF Nos. 23, 30. Thereafter, Plaintiff filed a stipulation of dismissal without prejudice as to Sechler and the action was dismissed without prejudice as against Sechler. *See* ECF No. 25; July 6, 2022 Order.

On July 6, 2022, Plaintiff filed its Amended Complaint against Defendant. *See* ECF No. 26. On September 22, 2022, Defendant filed the instant motion to dismiss pursuant to Rule 12(b)(6), which Plaintiff opposes. *See* ECF Nos. 33-35.

---

[2] Sechler moved in the alternative, pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, for an order directing Plaintiff to provide a more definite statement.

**DISCUSSION**

**I.     Standard of Review**

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotation omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation omitted).

The Court must "accept all 'well-pleaded factual allegations' in the complaint as true" and "'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'" *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020) (first quoting *Iqbal*, 556 U.S. at 679; then quoting *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009)). However, "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do," and dismissal is proper where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 555, 558.  A court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation omitted); *see also Iqbal*, 556 U.S. at 678 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Twombly*, 550 U.S. at 555)); *Ruston v.*

9

*Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (noting that "factual allegations must be sufficient to support necessary legal conclusions" and "plausibly suggest an entitlement to relief").

"In considering a motion to dismiss for failure to state a claim, '[a] district court is normally required to look only to the allegations on the face of the complaint,'" though "[it] may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

## II.   The Amended Complaint is Dismissed for Failure to State a Claim

For the reasons set forth below, Plaintiff's Amended Complaint is dismissed in its entirety for failure to state any claim upon which relief can be granted.

### A.   Plaintiff's New York State Human Rights Law Claim is Dismissed

Defendant argues that Plaintiff's Amended Complaint fails to state a claim for violation of New York State Executive Law § 296(13) ("Section 296(13)"). *See* Def.'s Br. at 5-16. Defendant argues that Plaintiff fails to plausibly allege discriminatory intent. *See* Def.'s Br. at 5-9. Defendant further argues that certain facts, which Defendant asserts can properly be considered in deciding the motion to dismiss because they are either subject to judicial notice or integral to the Amended Complaint, render Plaintiff's theory not plausible. *See* Def.'s Br. at 9-16. Specifically, Defendant points to U.S. Census data and information from the parties' product and store locators and argues that the data and information show that both Plaintiff and Defendant operate in a variety of demographic areas and contradict Plaintiff's theory that Defendant refuses to sell its chicken products to stores in areas with predominantly Black or Latino residents. *See* Def.'s Br. at 9-16.

In response, Plaintiff contends that the Amended Complaint pleads sufficient facts to support a plausible inference of racial discrimination – *i.e.*, that Defendant "discriminated against Plaintiff because of the make-up of its customer base." *See* Pl.'s Br. at 9-10.  In support of this contention, Plaintiff references the Amended Complaint's allegations that Plaintiff's business model is to serve lower income and diverse ethnic neighborhoods, and, as such, its stores are located in areas with predominantly Black and Latino residents; that Defendant initially referred Plaintiff to a third-party wholesaler to purchase Defendant's chicken products; that Plaintiff had purchased nearly $60,000 worth of Defendant's chicken products over a span of approximately two months; and that despite Plaintiff establishing itself as a profitable customer with the nearly $60,000 in purchases, once Defendant became aware of Plaintiff's business model to primarily service low income areas with predominately Black and Latino customers, Defendant – without any legitimate business reason – instructed various wholesalers not to sell Defendant's products to Plaintiff. *See* Pl.'s Br. at 9-10.  Plaintiff argues that Defendant cannot render Plaintiff's claims implausible by referencing "the occasional store" that sells Defendant's products in a neighborhood that has low income and/or ethnically diverse residents because those stores are "few and far between and generally are part of a 'big box' chain of supermarkets that mostly have stores in affluent, predominantly Caucasian areas so that the actual amount of chicken products that do wind up in the hands of Black and Latino customers is limited." *See* Pl.'s Br. at 10-11.

As relevant here, Section 296(13) provides:

> It shall be an unlawful discriminatory practice (i) for any person to boycott or blacklist, or to refuse to buy from, sell to or trade with, or otherwise discriminate against any person, *because of* the race, creed, color, national origin . . . of such person, or of such person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers or

customers, or (ii) for any person willfully to do any act or refrain from doing any act which enables any such person to take such action.

N.Y. Exec. Law § 296(13) (emphasis added).

Here, the allegations in the Amended Complaint fail to plausibly allege that Defendant acted with discriminatory intent – *i.e.*, that Defendant refused to sell to Plaintiff *because of* the race, color, and/or national origin of Plaintiff's customers. *See generally* Am. Compl. As an initial matter, the Amended Complaint does not allege facts directly demonstrating discriminatory intent. Notably, the Amended Complaint alleges that Defendant did not provide to Plaintiff any reason for the alleged refusal to allow Defendant's product to be sold at Plaintiff's stores; that neither Foodirect nor Robinson provided an explanation or reason why Defendant had instructed them to stop selling Defendant's chicken products to Plaintiff; and that Crescent Packing and Porky Products did not disclose the reason why they were not able to sell Defendant's chicken products to Plaintiff. *See* Am. Compl. ¶¶ 30, 41, 46, 49, 52-54.

The Amended Complaint also does not plausibly allege facts indirectly demonstrating discriminatory intent. Plaintiff attempts to establish its claim through allegations that Plaintiff was a valuable and profitable customer and therefore there was no legitimate business reason for Defendant to "implement a blacklist of Plaintiff purchasing its chicken products from any wholesaler" and that Defendant's products are sold in areas documented to be predominantly Caucasian while Plaintiff's stores are located in neighborhoods reputed to be communities of color. *See* Am. Compl. ¶¶ 55-62. These allegations, however, fall short of stating a claim under Section 296(13).

Although the allegations in the Amended Complaint plausibly allege that Plaintiff had previously purchased some of Defendant's product and that Plaintiff was not made aware of a legitimate business reason for Defendant refusing to allow its product to be sold to Plaintiff,

Plaintiff's allegations are insufficient to plausibly allege that Defendant did not in fact have a legitimate business reason – or, more critically, that Defendant acted with discriminatory intent. Plaintiff's subjective belief that Defendant's decision to not allow its product to be sold at Plaintiff's stores "made no sense from a business standpoint" does not demonstrate that Defendant acted with discriminatory intent. Plaintiff's reliance on its allegation that Plaintiff had purchased nearly $60,000 worth of Defendant's chicken products in approximately two months is unavailing, as that allegation does not demonstrate that Defendant lacked a legitimate business reason or, more critically, that Defendant had discriminatory intent, particularly in light of the absence of any additional factual allegations about Defendant's business operations – *e.g.*, about the scale of such operations.

Moreover, in the absence of any additional factual allegations relating to the stores that sell Defendant's chicken products, the demographics-related allegations in the Amended Complaint – *e.g.*, that Defendant's products are not available in any neighborhoods in which Plaintiff's stores are located, which consist of predominantly Black and Latino residents and are reputed to be communities of color, and that Defendant's chicken products are sold in areas documented to be predominantly Caucasian, *see* Am. Compl. ¶¶ 57-62 – fail to plausibly allege that Defendant acted with discriminatory intent. And, Plaintiff's bare allegation regarding "similarly situated companies," *see* Am. Compl. ¶¶ 73, 84, does not save Plaintiff's claim, particularly in light of the absence of any factual allegations whatsoever with respect to any such companies. *See generally* Am. Compl. Nor does Plaintiff's conclusory – and speculative – allegation that Defendant enacted its "blacklist" of Plaintiff only after Defendant "discovered" that Plaintiff "exclusively services low income areas with predominantly Black and Latino customers," *see* Am. Compl. ¶ 75, save Plaintiff's claim. *See Faber*, 648 F.3d at 104; *Ruston*,

13

610 F.3d at 59.

In sum, the Amended Complaint fails to plausibly allege that Defendant acted with

discriminatory intent.  Plaintiff's NYSHRL claim is dismissed.[3]

**B.      Plaintiff's New York City Human Rights Law Claim is Dismissed**

The parties, respectively, raise the same arguments with respect to Plaintiff's claim under

the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code

§ 8-107(18) ("Section 8-107(18)") as they do with respect to Plaintiff's claim under the

NYSHRL.  *See* Def.'s Br. at 5-16; Pl.'s Br. at 9-12.

As relevant here, Section 8-107(18) provides:

> It shall be an unlawful discriminatory practice (i) for any person to discriminate
> against, boycott or blacklist or to refuse to buy from, sell to or trade with, any
> person, *because of* such person's actual or perceived race, creed, color, national
> origin . . . or immigration or citizenship status or of such person's partners,
> members, stockholders, directors, officers, managers, superintendents, agents,
> employees, business associates, suppliers or customers, or (ii) for any person
> willfully to do any act or refrain from doing any act which enables any such person
> to take such action.

N.Y.C. Admin. Code § 8-107(18) (emphasis added).

Even under the more liberal standard of review that applies to NYCHRL claims, *see, e.g.*,

*Cooper v. Franklin Templeton Invs.*, No. 22-2763-cv, 2023 WL 3882977, at *2 (2d Cir. June 8,

2023) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir.

2013)), Plaintiff's claim fails.  Plaintiff fails to plead facts sufficient to support a plausible

inference of discriminatory intent on the part of Defendant.  As set forth above, the non-

conclusory allegations in the Amended Complaint neither directly nor indirectly demonstrate

discriminatory intent on the part of Defendant.  Plaintiff has not plausibly alleged that Defendant

---

[3]  In light of the above, the Court need not address Defendant's invitation to consider facts
outside of the Amended Complaint.

14

took any action *because of* the race, color, national origin, and/or immigration or citizenship status of Plaintiff's customers.

Plaintiff's NYCHRL claim is dismissed.

**C.    Plaintiff's Tortious Interference with Contract Claim is Dismissed**

Defendant argues that Plaintiff's tortious interference with contract claim should be dismissed because the Amended Complaint fails to plausibly allege that Plaintiff had a contract with Foodirect or Robinson that was breached.  *See* Def.'s Br. at 17-18.  Defendant notes that Plaintiff fails to attach any alleged contract or cite to – let alone quote – any contract provisions Plaintiff alleges were breached and argues that Plaintiff fails to show that Foodirect or Robinson had any future obligation to trade again with Plaintiff.  *See* Def.'s Br. at 18.  Defendant further argues that Plaintiff fails to allege facts showing that Defendant lacked the authority to prevent its wholesalers from selling Defendant's products to Plaintiff and notes that the fact that Plaintiff is ignorant of Defendant's authority over the distribution of its products is not enough to plausibly allege that such authority is absent.  *See* Def.'s Br. at 18.  Additionally, Defendant argues that the Amended Complaint does not plausibly allege that Defendant used wrongful means to procure the alleged breach.  *See* Def.'s Br. at 19-20.

In response, Plaintiff argues that it has set out the history of the negotiations on pricing, quantity needed, the frequency of delivery of the product, and the consideration paid to both third-party wholesalers, which is sufficient to plausibly allege that a contract existed.  *See* Pl.'s Br. at 13.  Plaintiff further argues that Foodirect and Robinson are not agents of Defendant and Defendant does not exercise direct control over them, and, therefore, the only way for Defendant to instruct Foodirect and Robinson "not to sell its product to Plaintiff is to coerce them into not doing so by exerting economic pressure by threatening not to sell them any of [Defendant's]

products for distribution in the future." *See* Pl.'s Br. at 13-14.  Plaintiff argues that it has plausibly alleged that Defendant employed wrongful means in interfering with Plaintiff's contracts with Foodirect and Robinson by alleging that Defendant's interference was motivated solely by Defendant's malice towards the race, color, national origin, and/or immigration or citizenship status of Plaintiff's customers.  *See* Pl.'s Br. at 14.

"Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).

Here, Plaintiff has failed to adequately allege that a valid contract existed between Plaintiff and Foodirect and has failed to adequately allege that a valid contract existed between Plaintiff and Robinson.  Although Plaintiff alleges that following negotiations with regard to pricing, quantity need, and delivery, Plaintiff entered into an agreement with Foodirect to regularly purchase chicken products from Foodirect and that "pursuant to agreement," Plaintiff issued weekly purchase orders to Foodirect and purchased Defendant's chicken products from Foodirect, *see* Am. Compl. ¶¶ 26-27, Plaintiff fails to allege any details about the alleged agreement, including any details with respect to any ongoing obligation by Foodirect to continue supplying Plaintiff with Defendant's products after the prior weekly purchase orders were issued, *see generally* Am. Compl.  Similarly, although Plaintiff alleges that Plaintiff entered into an agreement with Robinson to regularly purchase Defendant's chicken products from Robinson and that pursuant to that agreement, Plaintiff issued weekly purchase orders to Robinson and

16

purchased Defendant's chicken products from Robinson, *see* Am. Compl. ¶¶ 36-37, Plaintiff

again fails to allege any details about the alleged agreement, including any details with respect to

any ongoing obligation by Robinson to continue supplying Plaintiff with Defendant's products

after the prior weekly purchase orders were issued, *see generally* Am. Compl.  Notably, Plaintiff

neither alleges that any written contract exists with respect to either Foodirect or Robinson nor

attaches any such contract to the Amended Complaint – or even quotes from any such contract.

*See, e.g.*, *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 643 (S.D.N.Y.

2018) (finding that counter-plaintiff "ha[d] not alleged the existence of a binding contract with

third parties" because it "fail[ed] to provide any details about the contracts – such as when they

were formed, when they took place, and what the major terms were – or even attach the contracts

to the complaint").

       Plaintiff's conclusory allegation that at all relevant times, "Plaintiff has had a valid and

enforceable contract with both Foodirect and Robinson for the wholesale purchase of

Defendant's chicken products," *see* Am. Compl. ¶ 94, is insufficient to establish the existence of

a valid contract.  *See Faber*, 648 F.3d at 104; *Ruston*, 610 F.3d at 59.

       Because Plaintiff fails to, *inter alia*, plausibly allege that there was a valid contract of

which Defendant could be aware or as to which Defendant could intentionally procure a breach,

Plaintiff's claim fails.[4]

---

[4] Even assuming, *arguendo*, that Plaintiff had sufficiently alleged valid contracts of which
Defendant was aware and that Plaintiff had sufficiently alleged that Defendant intentionally
procured the wholesalers' respective breaches of those contracts, Plaintiff's claim would
nevertheless fail because Plaintiff fails to allege facts sufficient to demonstrate that Defendant
lacked justification in procuring the alleged breaches by the wholesalers.  Plaintiff alleges that
"[a]t no time prior to entering into its contract or during the time they were selling Defendant's
product" did Foodirect or Robinson "ever indicate that the sale of Defendant's chicken
products to Plaintiff required the express approval of the Defendant."  *See* Am. Compl. ¶¶ 32,
42.  And Plaintiff alleges that "[a]t no time has anyone provided any proof or evidence of

Plaintiff's tortious interference with contract claim is dismissed.

**D.    Plaintiff's Tortious Interference with Prospective Business Relations Claim is Dismissed**

Defendant argues that Plaintiff's claim for tortious interference with prospective business relations should be dismissed because "it is not novel that a manufacturer has authority to direct its wholesaler's distribution and sales" and Plaintiff has failed to allege facts showing that Defendant acted solely out of malice, or used dishonest, unfair, or improper means. *See* Def.'s Br. at 21.

In response, Plaintiff argues that the Amended Complaint sets forth all of the required elements of a cause of action for tortious interference with prospective business relations because Plaintiff has "clearly pleaded" that it was in negotiations with Crescent Packing and Porky Products, each of which had agreed to sell Defendant's product to Plaintiff subject to the negotiation of terms; that Defendant interfered with those negotiations; that Defendant acted for a wrongful purpose based on its malice toward the race, color, national origin, and/or immigration or citizenship status of Plaintiff's customers; and that Defendant's actions not only injured, but effectively severed the otherwise legitimate business relationship between Plaintiff and the wholesalers. *See* Pl.'s Br. at 15-16.

---

Defendant's authority to interfere with any contracts or business relationship" by and between Plaintiff and Foodirect, or by and between Plaintiff and Robinson. *See* Am. Compl. ¶¶ 33, 43. Plaintiff's lack of awareness of whether Defendant had the authority to direct Foodirect and Robinson to stop selling Defendant's chicken products to Plaintiff does not, however, plausibly demonstrate that Defendant did not actually have such authority.  The Court need not accept as true Plaintiff's conclusory allegations that "upon information and belief, Defendant intentionally and improperly directed" Foodirect and Robinson "to cease all sales of Defendant's chicken products to Plaintiff," and that "Defendant tort[ious]ly interfered with" Plaintiff's contracts with Foodirect and Robinson. *See* Am. Compl. ¶¶ 98-99, 101-102; *see also Faber*, 648 F.3d at 104; *Ruston*, 610 F.3d at 59.

"The elements of tortious interference with a business relationship are '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'" *Katz v. Travelers*, 241 F. Supp. 3d 397, 404 (E.D.N.Y. 2017) (quoting *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  "As compared to the tort of tortious interference with contract, where there has been no breach of an existing contract, but only interference with prospective contract rights[,] plaintiff must show more culpable conduct on the part of the defendant." *Gortat v. Capala Bros.*, No. 07-CV-03629, 2011 WL 6945186, at *4 (E.D.N.Y. Dec. 30, 2011) (alterations accepted) (quotation omitted); *see also Catskill Dev., L.L.C.*, 547 F.3d at 132 (noting that "[t]he wrongful means requirement" makes alleging and proving a tortious interference with business relations claim "more demanding than proving a tortious interference with contract claim" (quotation omitted)); *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (noting that "a claim for tortious interference with business relations requires a plaintiff to show, 'as a general rule,' that 'the defendant's conduct amounted to a crime or an independent tort'" (alterations accepted) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004))).

Plaintiff, having failed to state a claim for tortious interference with contract, has also failed to meet the higher burden for stating a claim for tortious interference with prospective business relations.  Plaintiff has not plausibly alleged, *inter alia*, that Defendant acted for a wrongful purpose or used dishonest, unfair, or improper means.  Plaintiff's conclusory allegation that "Defendant's interference . . . was motivated solely and exclusively by Defendant's malice toward Plaintiff because of the race, color, national origin and/or immigration or citizenship status of Plaintiff's customers," *see* Am. Compl. ¶ 113, is not sufficient and cannot save

19

Plaintiff's tortious interference with prospective business relations claim.  *See Faber*, 648 F.3d at 104; *Ruston*, 610 F.3d at 59.

Plaintiff's tortious interference with prospective business relations claim is dismissed.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss, ECF No. 33, is GRANTED and the Amended Complaint, ECF No. 26, is dismissed.[5]

The Clerk of Court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

*/s/ Diane Gujarati*
DIANE GUJARATI
United States District Judge

Dated: September 27, 2023
       Brooklyn, New York

---

[5] Dismissal here is without leave to amend.  As an initial matter, Plaintiff has not sought leave to further amend.  *See generally* docket; *see also* ECF No. 34.  Further, Plaintiff was apprised of Defendant's view of the pleading defects with respect to Plaintiff's claims by way of Defendant's first letter motion for a pre-motion conference, *see* ECF No. 11, Defendant's first motion to dismiss, *see* ECF No. 15, the oral argument on Defendant's first motion to dismiss, *see* ECF Nos. 23, 30, and Defendant's second letter motion for a pre-motion conference, *see* ECF No. 27; Plaintiff already was afforded – and availed itself of – an opportunity to amend; Plaintiff's Amended Complaint fails to cure the deficiencies in any of Plaintiff's claims; and there is no indication that Plaintiff could provide additional factual allegations that might cure the deficiencies set forth above and lead to a different result – indeed, Plaintiff proffers no such additional allegations.  *See Gallop v. Cheney*, 642 F.3d 364, 369-70 (2d Cir. 2011); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257 (2d Cir. 2018).